AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
3/26/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___jb___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
MAR 2 6 2021
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

| United States of America | |
|---|---|
| v. | Case No. 2:21-mj-01484-DUTY |
| ROSARIO VEGA-ORDUNO, | |
| Defendant(s) | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 25, 2021 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*Patrick Hazelwood*
Complainant's signature

Patrick Hazelwood, DEA Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 ~~by telephone~~ *in person*

Date: *March 26, 2021*
*3:43 pm*

Judge's signature

City and state: Los Angeles, California    Hon. Karen Stevenson, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT**

I, Patrick J. Hazelwood, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against ROSARIO VEGA-ORDUNO ("VEGA-ORDUNO") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), in the custody of the United States Drug Enforcement Administration ("DEA"), in Ventura, California, as described more fully in Attachment A: a black Samsung phone inside a black case, bearing IMEI 354212112988442, found in VEGA-ORDUNO's pocket.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest

warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5. I am a Special Agent ("SA") with the DEA and have been so employed since October 2018. My current assignment is the Ventura Resident Office. Prior to my current assignment, I was assigned to the Los Angeles Field Division Office Enforcement Group 4. To become a DEA SA, I attended the DEA Academy in Quantico, Virginia, for approximately four months. I have received hundreds of hours of training in various investigative techniques, including specialized training in the recognition and processing of controlled substance identification, the methods and means of narcotics violators, narcotics packaging, narcotics paraphernalia and terminology, narcotics prices, field testing of narcotics, interview and interrogation techniques, surveillance techniques, undercover operations, confidential source management, and the effects of controlled substances on abusers.

6. Through my training, education and experience, I am familiar with identifying illegal drugs, the methods narcotics traffickers use to import, manufacture, and distribute illicit and illegal drugs, the payment methods for buying and selling illicit drugs, and the methods drug traffickers use to avoid law

enforcement detection, including disguising the source and illegal nature of drug proceeds.

### III. SUMMARY OF PROBABLE CAUSE

7.   On March 25, 2021, members of the DEA Ventura Resident Office conducted a buy/bust operation in the McDonald's parking lot at 4860 Santa Rosa Road, Camarillo, California.  During the operation, agents arrested VEGA-ORDUNO and seized approximately 11.9 gross kilograms of suspected methamphetamine from the trunk of his vehicle, as well as the SUBJECT DEVICE from VEGA-ORDUNO's pocket.  During a Mirandized interview, VEGA-ORDUNO stated that he was instructed to deliver 26 pounds of methamphetamine for sale.  The suspected methamphetamine field tested positive for the presence of methamphetamine.

### IV. STATEMENT OF PROBABLE CAUSE

8.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Initial Investigation and March 17, 2021 Controlled Purchase of Methamphetamine**

9.   During the month of February 2021, narcotics investigators from the Ventura County Combined Agency Team ("VCAT") and the DEA began an ongoing narcotics investigation into unidentified sources of drug supply believed to be in Mexico who distribute multi-pound quantities of methamphetamine throughout Southern California.

10. In February 2021, at the direction of law enforcement, a VCAT Confidential Source ("CS1")[1] communicated with a source of supply believed to be in Mexico ("SOS1"). CS1 then began communicating with an associate of SOS1, another believed source of drug supply ("SOS2"). At the direction of law enforcement, CS1 then connected SOS2 to a second confidential source working with law enforcement ("CS2")[2] and introduced CS2 as another potential buyer.

11. Prior to March 17, 2021, at the direction of agents, CS2 contacted SOS2 and coordinated the purchase of two pounds of methamphetamine from a local courier who utilized a telephone number ending in 8755, for $3,800. Throughout the month of March, CS2 had been in communication with the user of the number ending in 8755 to negotiate a drug transaction. During these communications, CS2 stated that the user of the 8755 number quoted him/her a price of $1,500 per pound of methamphetamine and agreed to meet in the city of Camarillo on March 17, 2021.

---

[1] CS1 has previously worked with VCAT in exchange for financial benefits before being terminated for lack of need. CS1 was then again signed up to work with VCAT after being arrested for narcotics offenses and is currently working as a CS with VCAT for consideration in connection with that arrest for narcotics offenses.

[2] CS2 is being paid to assist law enforcement. CS2 has been working with the DEA since approximately 2010. CS2 has known convictions for the following crimes: possession and transportation of a controlled substance, violating a court order to prevent domestic violence, and driving under the influence. CS2 has provided information in the past that has been corroborated and led to the seizure of narcotics.

4

12. On March 17, 2021, at approximately 11:32 a.m., the user of the 8755 number contacted CS2 via text message and told him/her that he was getting close to Camarillo. At approximately 12:17 p.m., CS2 received a text message from the user of the 8755 number, which stated that he was located at 2360 Ventura Boulevard Camarillo, CA 93010. CS2 replied by sending the address of the McDonald's and a description of CS2's car. At approximately 12:35 p.m., SA Michael Johnson saw a Silver Honda Pilot bearing license plate #859K02[3] pull into the McDonald's parking lot and park south of the CS2's vehicle. SA Johnson saw an older Hispanic male, wearing a black hat and a black jacket with a blue shirt underneath, occupying the driver's seat of the vehicle. SA Johnson saw the Hispanic male exit the driver's side of his car and begin using his cellular phone. The man then walked away from his car for a short time, before returning to his car and moving forward one parking spot. At approximately 12:38 p.m., SA Johnson saw CS2 exit his/her car and walk over to the Honda Pilot empty handed. A short time later, SA Johnson observed CS2 walk back to his/her car carrying a white grocery bag in his/her left hand and get into his/her car. Shortly thereafter, surveillance units saw the Honda Pilot exit the parking lot and ultimately park at a location on Bracken Street in Arleta, CA.

---

[3] The registered owner of the Honda Pilot is ROSARIO VEGA-ORDUNO, 309 Cottonwood CT Unit 2, Incline Village, Nevada 89451.

13. I took custody of the suspected methamphetamine from CS2's vehicle.[4] The suspected methamphetamine was inside two clear Ziploc bags that were in a white grocery bag, which CS2 had been handed during the transaction with the user of the 8755 number.

14. Following this March 17, 2021 controlled purchase, the individual who sold the methamphetamine to CS2 was initially misidentified and believed to be an individual with initials M.A. However, after the March 24, 2021 purchase and arrest of VEGA-ORDUNA discussed directly below, VEGA-ORDUNA was then correctly identified as the individual who sold CS2 the methamphetamine on March 17, 2021.

### B. March 25, 2021 Sale of Methamphetamine and Arrest of VEGA-ORDUNO

15. During the evening of March 24, 2021, CS2 spoke with the user of the 8755 number and requested to purchase 26 pounds of methamphetamine and two kilograms of heroin on the following day, to which the user of the 8755 number agreed. The user of the 8755 number communicated with CS2 later in the evening, via text message, indicating that he was in possession of the methamphetamine but was waiting on the heroin.

16. On March 25, 2021, during recorded communications with CS2, the user of the 8755 number confirmed that he would be

---

[4] CS2 and CS2's car were searched by law enforcement prior to the meeting with the user of the 8755 phone, and no drugs were found. Additionally, prior to the controlled purchase, CS2 was provided with a recording device, which was used to record the buy. However, during the file transfer following the buy, it appears that the file was inadvertently corrupted or deleted, and the recording appears to no longer be available.

bringing the 26 pounds of methamphetamine and informed CS2 that he would not be able to bring the heroin. The user of the 8755 number also indicated to CS2 that he would be in the area of the same McDonald's where the prior March 17, 2021 drug deal had taken place, between 5:00 and 6:30 p.m.

17. On March 25, 2021, at approximately 5:35 p.m., Det. Freede and I met with CS2 at a neutral location in anticipation of the meeting with VEGA-ORDUNO. As we did previously with the March 17, 2021 controlled purchase, Det. Freede and I searched CS2 and CS2's car for narcotics and large amounts of money with negative results. CS2 was provided with a digital audio recording/transmitting device. CS2 was also provided with a digital audio/video recording device within the vehicle which was not utilized. At approximately 5:36 p.m., CS2 departed the neutral location, as witnessed by Det. Freede and me. At approximately 5:39 p.m., surveillance units were set up in the area of the McDonald's and observed the same Honda Pilot, registered to VEGA-ORDUNO, parked near the east side of the parking lot. Agent William Torrence saw that the Honda Pilot was occupied by two males,[5] and he later saw both males get out of the car, walk toward the McDonald's, and ultimately return to the car. At approximately 5:44 p.m., CS2 arrived to the McDonald's parking lot and parked near the Honda Pilot. Det. Vince DeLaCerda saw CS2 reposition his/her car closer to the Honda Pilot, get out of his/her car and walk to the driver's

---

[5] As discussed below, the occupants of the car were later identified as VEGA-ORDUNO and J.V.

side of Honda Pilot. SA Jeffrey LaRock then saw CS2 enter the driver's side back passenger seat of the Honda Pilot and close the door. A short time later, SA LaRock saw CS2 get out of the Honda Pilot and begin walking toward the trunk of CS2's car.

18. At approximately 5:51 p.m., agents converged on the location and detained the driver of the Honda Pilot (VEGA-ORDUNO) and the passenger (J.V.). SA Michael Johnson searched the Honda Pilot and found a tan bag in the trunk, which contained approximately 26 plastic baggies containing suspected methamphetamine. Agents also found the SUBJECT DEVICE in VEGA-ORDUNO's pocket. I then called the 8755 number, which had been used to set up both the March 17, 2021 and March 25, 2021 methamphetamine purchases, and the SUBJECT DEVICE rang. I conducted a field test on the suspected methamphetamine and the results were positive for the presence of methamphetamine.

C.   **VEGA-ORDUNO's Statements**

19. At approximately 6:46 p.m., VEGA-ORDUNO was transported to the Ventura County Sheriff's Office booking facility and placed in an interview room.

20. After being advised of his Miranda rights, VEGA-ORDUNO stated the following:

    a.   When questioned about why he brought drugs to Camarillo, VEGA-ORDUNO stated to investigators that he was instructed to bring the drugs to Camarillo to drop them off to someone. On March 24, 2021 at around 10:30 p.m., he picked up the 26 pounds of methamphetamine and was instructed to bring the

26 pounds to Camarillo on the following day and was promised $1000 to do so.

  b. When VEGA-ORDUNO was questioned about March 17, 2021, VEGA-ORDUNO recalled that he was instructed to "bring 2" (which I believe, based on my training and experience, to be referring to two pounds of methamphetamine) to a person who wanted them as a sample.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

21. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

  a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

  b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

  c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-

mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

        e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

22. As used herein, the term "digital device" includes the SUBJECT DEVICE.

23. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

   b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

25. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

 a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

 b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

 c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

13

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress VEGA-ORDUNO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of VEGA-ORDUNO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

26. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

27. For all of the reasons described above, there is probable cause to believe that VEGA-ORDUNO has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 ~~by~~ *in person* ~~telephone~~ on this 26 day of March, 2021.   3:43pm

_____
THE HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE

14